UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

UNITED STATES OF AMERICA                    CRIMINAL ACTION

VERSUS                                      NO: 21-111

ADRIAN DEXTER TALBOT                        SECTION: "H"

## ORDER AND REASONS

Before the Court is Defendant Adrian Talbot's Motion for Acquittal and
New Trial (Doc. 242). For the following reasons, the Motion is **DENIED**.

## BACKGROUND

After a nine-day jury trial, Defendant Adrian Dexter Talbot, M.D. was
convicted on all seven charges, including one count of conspiracy to unlawfully
distribute and dispense controlled substances in violation of 21 U.S.C. § 846;
four counts of unlawful distribution and dispensing of controlled substances in
violation of 21 U.S.C. § 841(a)(1); one count of maintaining a drug-involved
premises in violation of 21 U.S.C. § 856(a)(1); and one count of conspiracy to
commit health care fraud in violation of 18 U.S.C. § 1349.

The evidence at trial revealed that beginning in February 2015 and
continuing through July 2018, Defendant, a medical doctor, prescribed

controlled substances outside the scope of professional practice and not for a legitimate medical purpose from his clinic, Medex Clinical Consultants P.L.L.C. ("Medex"), located in Slidell, Louisiana. While issuing prescriptions for controlled substances from Medex, Defendant also worked full-time at the Alexandria Veteran's Medical Center ("Alexandria VA") in Alexandria, Louisiana, approximately three-and-a-half hours away from Medex. Patients at Medex were seen by various nurse practitioners and handed pre-signed prescriptions for controlled substances by the office manager, Robbie Wiggins. Although Defendant only accepted cash from his patients for visits, the patients filled their prescriptions using insurance benefits, including Medicare, Medicaid, and Blue Cross Blue Shield of Louisiana. In November 2016, Defendant hired Dr. Anil Prasad to work at Medex. Prasad rarely visited with existing patients, pre-signed prescriptions for controlled substances, and did not have the authority to alter or change the prescriptions of Defendant's existing patients.

Defendant now moves for acquittal, arguing that there was insufficient evidence to convict him of Counts 1, 6 and 7. He also sets forth several arguments that he believes warrant a new trial. The Government opposes. This Court will consider each of Defendant's arguments in turn.

## LEGAL STANDARD

### A. Motion for Acquittal

Under Rule 29 of the Federal Rules of Criminal Procedure, a defendant may move for a "judgment of acquittal of any offense for which the evidence is

insufficient to sustain a conviction."[1] "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[2] To this end, the court must "review the evidence and the reasonable inferences which flow therefrom in the light most favorable to the verdict."[3] The court is "concerned only with whether the jury made a rational decision, not whether its verdict was correct on the issue of guilt or innocence."[4]

## B. Motion for New Trial

Federal Rule of Criminal Procedure 33(a) states, "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."[5] The Fifth Circuit has held "the trial court should not grant a motion for new trial unless there would be a miscarriage of justice or the weight of evidence preponderates against the verdict. A new trial is granted only upon demonstration of adverse effects on substantial rights of a defendant."[6] The movant bears the burden of demonstrating that a new trial is justified.[7]

---

[1] FED. R. CRIM. P. 29.
[2] Jackson v. Virginia, 443 U.S. 307, 319 (1979).
[3] United States v. Ramos-Cardenas, 524 F.3d 600, 605 (5th Cir. 2008) (internal quotations omitted).
[4] *Id.* (internal quotations omitted).
[5] FED. R. CRIM. P. 33.
[6] United States v. Wall, 389 F.3d 457, 466 (5th Cir. 2004).
[7] United States v. Soto-Silva, 129 F.3d 340, 343 (5th Cir. 1997).

# LAW AND ANALYSIS

## A. Defendant's Motion for Acquittal

Defendant argues that there was insufficient evidence to support his conviction on Counts 1, 6, and 7.

### 1. Count 1

Defendant contends that the Government failed to present sufficient evidence at trial to prove Count 1—conspiracy to unlawfully distribute and dispense controlled substances. The Indictment alleges that between February 2015 and July 2018, Defendant conspired with Anil Prasad and others to distribute and dispense controlled substances outside the scope of professional practice and not for a legitimate medical purpose. In order to prove a conspiracy to distribute and dispense controlled substances, the Government must show: (1) that two or more persons, directly or indirectly, reached an agreement to unlawfully distribute or dispense controlled substances in an unauthorized manner; (2) that the defendant knew of the unlawful purpose of the agreement; (3) that the defendant joined in the agreement willfully, that is with the intent to further its unlawful purpose; and (4) that the overall scope of the conspiracy involved at least a detectable amount of a Schedule II controlled substance.[8] Defendant alleges that the Government failed to prove these elements because (1) it did not show that he was part of a continuous conspiracy from February 2015 to July 2018; (2) it did not show that Defendant

---

[8] Pattern Crim. Jury Instr. 5th Cir. 2.97 (2019); Trial Tr. at 2382.

4

agreed with another person; and (3) it did not show that Defendant prescribed any controlled substance for other than a legitimate medical purpose.

As to his first argument, Defendant points out that none of the other doctors or nurse practitioners that worked at Medex were employed there for the duration of the conspiracy. Defendant argues that the only provider he could have conspired with at the start of the conspiracy was Maximo Martell, who left the clinic nearly a year before Anil Prasad began working there. He argues, therefore, that the Government could not have proven one continuous conspiracy.

In fact, the Government proved that Defendant was the "key man" in the conspiracy and that the employees of Medex—who came into and out of the conspiracy at different points in time—served functions in support of the common goal of the conspiracy. Specifically, the Government proved that even while Defendant was working hours away at the Alexandria VA, the clinic continued to run through the acts of the Medex employees and his patients continued to receive the prescriptions for controlled substances that he had written. Further, Defendant fails to acknowledge that the clinic office manager, Robbie Wiggins, *was* in fact employed at the clinic for the duration of the conspiracy. There was ample evidence of her involvement in the conspiracy, including handing out pre-signed prescriptions to patients, collecting cash from patients, and fielding requests for medications from patients and relaying them to Defendant.[9] Accordingly, this argument fails.

Next, Defendant argues that the Government did not show that he had agreed with another person to distribute unauthorized prescriptions. Here

---

[9] Trial Tr. at 349–370, 381–387.

5

again, the Government proved that Defendant was the "key man" and that the employees of Medex served functions in support of the common goal of the conspiracy. "A single conspiracy exists where a 'key man' is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal."[10] As the Government explained:

> Wiggins' role was to collect money from patients and distribute prescriptions to patients because there was typically no physician on site and the nurse practitioners were not comfortable distributing prescriptions for controlled substances, as they were not permitted to prescribe controlled substances in connection with the treatment of chronic pain. The nurse practitioners' roles were to assess the patients for acute care needs, but they did not treat their chronic pain. Dr. Prasad's role, when he arrived, was to sign the prescriptions for controlled substances, which had already been determined by Defendant.[11]

The evidence showed that Anil Prasad agreed with Defendant to pre-sign prescriptions for Defendant's patients with their information and medication already printed on them and that Defendant, not Prasad, made the decision as to what medication and dosage those patients would receive.[12] Prasad testified that any changes to a patient's prescription had to be reviewed by Defendant.[13] He admitted that he also signed blank prescriptions at Defendant's instruction and that he assumed those were used to print prescriptions for controlled substances.[14] Further, Ms. Wiggins agreed to hand out the pre-signed prescriptions to patients.[15] Accordingly, there was ample evidence at trial to

---

[10] United States v. Richerson, 833 F.2d 1147, 1154 (5th Cir. 1987).
[11] Doc. 251 at 10.
[12] Trial Tr. at 1008.
[13] *Id.* at 1007, 1049.
[14] *Id.* at 1007, 1017.
[15] *Id.* at 488.

show that two or more persons, directly or indirectly, reached an agreement to unlawfully distribute or dispense controlled substances in an unauthorized manner.

Third, Defendant argues that the Government did not prove that he prescribed controlled substances for other than a legitimate medical purpose. Defendant admits that pursuant to *United States v. Lamartiniere*, to prove that a prescription is unauthorized, the Government need only prove *either* that it lacks a legitimate medical purpose *or* that it was issued outside the usual course of professional practice.[16] Defendant does not argue that there was insufficient evidence to show that the prescriptions were issued outside the usual course of professional practice. However, Defendant argues that because the Indictment alleged that Defendant issued prescriptions *both* without a legitimate medical purpose *and* outside the usual course of professional practice, then the Government must prove both. This argument fails.

"It is well-established in this Circuit that a disjunctive statute may be pleaded conjunctively and proved disjunctively."[17] Accordingly, consistent with the Fifth Circuit's holding in *Lamartiniere*, the Government need only have proven that the prescriptions were issued outside the usual course of professional practice.[18] Even so, the Government presented ample evidence that Defendant issued prescriptions to patients without a legitimate medical purpose. In fact, the Government's expert, Dr. Tricia Aultman, testified that in the patient charts she reviewed, none of the prescriptions issued by Defendant

---

[16] United States v. Lamartiniere, 100 F.4th 625, 638 (5th Cir. 2024).
[17] United States v. Holley, 831 F.3d 322, 328 (5th Cir. 2016)
[18] *Lamartiniere*, 100 F.4th at 638.

were for a legitimate medical purpose.[19] Further, Prasad testified that 80 to 90 percent of Defendant's patients were on controlled substance regimens that were dosed too high.[20] Accordingly, Defendant's arguments as to Count 1 fail.

### 2. Count 6

Defendant next argues that the Government failed to prove Count 6— maintaining a drug-involved premises. The elements of proof of maintaining a drug-involved premises are that the defendant knowingly and intentionally used or maintained a place for the purpose of distributing a controlled substance in an unauthorized manner.[21] Defendant argues that the Government failed to prove that (1) he exercised any control over Medex, and (2) that distributing unauthorized prescriptions was a significant purpose of the premise.

In support of his first argument, Defendant points to several references at trial by the Government and witnesses that the Medex clinic "ran itself." He argues that these references indicate that he had little to no control over the premises at issue. The Fifth Circuit has advised that in determining whether a person "maintained" a drug-involved premises, the court should consider whether he "(1) has an ownership or leasehold interest in the premises, (2) was in charge of the premises, or (3) exercised 'supervisory control' over the premises."[22] Evidence presented at trial established that Defendant owned both Medex and Empire Associates, L.L.C., which owned the property that Medex leased for its clinic.[23] Further, the evidence showed that Defendant

---

[19] Trial Tr. at 1096.
[20] *Id.* at 1047.
[21] Pattern Crim. Jury Instr. 5th Cir. 2.99 (2019); Trial Tr. at 2387.
[22] United States v. Barnes, 803 F.3d 209, 216 (5th Cir. 2015).
[23] Government Exhibit 101.

hired employees and set up processes at Medex so that his patients would continue to receive prescriptions for controlled substances even while he was working at the Alexandria VA hours away. Accordingly, there was sufficient evidence presented at trial that Defendant both owned and controlled the premises at issue in Count 6.

Next, Defendant argues that there was insufficient evidence that the distribution of unauthorized prescriptions as a significant purpose of the Medex clinic. First, he contends that the clinic had been in operation since 2010 and that therefore the time period at issue spans "an infinitely small period of time compared with the entirety of Medex's existence."[24] Defendant does not, however, cite to any case law providing that a premises' purpose must be viewed in light of its entire existence. Rather, the Indictment charges that Defendant maintained a drug-involved premises from February 2015 to July 2018. The Government need only have proven that the distribution of controlled substances was a significant purpose of the clinic during that time. The evidence at trial supported a finding that it was. The Government showed and witnesses testified that a majority of Defendant's patients received prescriptions for controlled substances.[25] Accordingly, the evidence presented at trial was sufficient to convict Defendant of Count 6.

### 3. *Count 7*

Finally, Defendant argues that the Government did not prove Count 7—conspiracy to commit health care fraud. The elements of proof of conspiracy to commit health care fraud are: (1) that the defendant and at least one other

---

[24] Doc. 242.
[25] Trial Tr. at 1018.

person agreed to commit health care fraud; (2) that the defendant knew the unlawful purpose of the agreement; and (3) that the defendant joined in the agreement willfully, with the intent to further the unlawful purpose.[26] Defendant argues that the Government did not prove (1) that Defendant had an agreement to defraud health benefit programs, and (2) that Defendant willfully joined in that agreement. In support, Defendant points out that he stopped taking health insurance at Medex and transitioned to cash payments during the conspiracy period. He alleges that the Government did not show that he knew his patients were using health insurance to cover the costs of the prescriptions he gave them. Defendant also points out that he did not gain anything from the alleged fraud.

In fact, there was evidence presented at trial that the Medex staff spent significant amounts of time dealing with insurance companies and filling out prior authorization forms for insurance companies to pay for patients' prescriptions.[27] One such employee testified that Defendant explained the prior authorization process to her and instructed her how to complete the forms when she began working at Medex.[28] A rational trier of fact could find that Defendant benefited from the arrangement in which his patients paid cash for visits and used their health care benefit programs to pay for the prescriptions he issued. Accordingly, sufficient evidence was presented at trial to support a finding that Defendant had an agreement to defraud health benefit programs and willfully joined in that agreement. Defendant's arguments for acquittal

---

[26] Pattern Crim. Jury Instr. 5th Cir. 2.15A (2019); Trail Tr. at 2389.
[27] Trial Tr. at 381, 1060, 1799–1800.
[28] *Id.* at 1800.

fail, and the jury reached a rational decision based on sufficient evidence as to all counts.

### B. Defendant's Motion for New Trial

Defendant next asserts several arguments—ranging from prosecutorial misconduct to erroneous evidentiary rulings—that he contends support a vacatur of his conviction and new trial. This Court will consider each argument in turn.

### 1. Brady *Violation*

Defendant first argues that the Government violated its *Brady* obligations with respect to information regarding inspections and investigations of Medex by the Drug Enforcement Administration ("DEA"). Defendant requested information from the DEA through a Freedom of Information Act ("FOIA") request in November 2023, but the request was denied because the DEA claimed that there was an ongoing investigation into Defendant. Thereafter, the prosecution in this case produced documents from the State Medical Board that included various reports from the DEA created in 2006, 2010, and 2012. Defendant thereafter—two days before trial—asked the Government whether there were any other DEA documents related to investigations or inspections of Defendant or Medex. The Government responded that it was not in possession of that information and that the DEA was not part of the prosecution team.

Out of an abundance of caution, this Court instructed the Government to contact the DEA and inquire whether there were any further inspections or investigations into Defendant or Medex following the April 20, 2012 DEA

investigation that was disclosed as a part of discovery.[29] The Government did so and informed the Court that according to the DEA there were no post-2012 investigations or pending investigations into Defendant or Medex and no cyclic inspections of Medex during the time period of the conspiracy.[30] The DEA also advised that it is not its policy to perform routine, cyclical inspections of doctors' offices.[31]

Defendant felt that the DEA's response indicated that his FOIA request had been improperly denied, and he moved to subpoena records from the DEA relating to Defendant and Medex going back to 2010.[32] Defendant argued that the DEA documents were important because they would show that, despite the DEA consistently inspecting and investigating Defendant and Medex, the DEA reported no problems with either. The Court denied his motion on the record, stating that the request lacked specificity and amounted to a fishing expedition.[33]

Defendant now moves for a new trial, arguing that the Government's failure to turn over records from the DEA was a *Brady* violation. "When a defendant seeks a new trial on the basis of a *Brady* violation, he must show that (1) the prosecution did not disclose the evidence; (2) the evidence was favorable to the defense; and (3) the evidence was material."[34] "Evidence is 'material' if there is a reasonable probability that, had the evidence been

---

[29] Trial Tr. at 1507.

[30] *Id.* at. 42.

[31] *Id.*

[32] Doc. 221.

[33] Doc. 226, Trial Tr. at 1498–1508.

[34] United States v. Davis, 609 F.3d 663, 696 (5th Cir. 2010).

disclosed to the defense, the result of the proceeding would have been different."[35]

The Court notes at the outset that Defendant still fails to identify with any specificity what documents exist that were not turned over. Defendant's argument hinges on his belief—which was denied by the DEA—that routine, cyclical inspections of pain management clinics are performed by the DEA every three to five years. He argues that records of these inspections—assuming they occurred—may show that the DEA found no problem with Defendant's prescribing practices. Defendant's arguments are entirely speculative. *Brady* requires the Government to disclose "exculpatory evidence known to it—or in its possession."[36] The Government has consistently maintained that the DEA was not part of the prosecution team in this case and that it is not aware of any evidence of DEA inspections or investigations that was not disclosed. The DEA maintained that there were no post-2012 investigations or pending investigations into Defendant or Medex and no records of cyclical inspections of Medex during the time period of the conspiracy. "[T]here are limits on the imputation of knowledge from one arm of the government to prosecutors," and the Government is deemed only to "have knowledge of information readily available to it."[37] Defendant has not shown that DEA records of inspections or investigations of Defendant or Medex were readily available to the Government in this case, or indeed, that they exist at

---

[35] *Id.*
[36] Strickler v. Greene, 527 U.S. 263, 278 (1999).
[37] United States v. Webster, 392 F.3d 787, 798 (5th Cir. 2004).

all. "*Brady* does not permit a defense fishing expedition whenever it is conceivable that evidence beneficial to defendants may be discovered."[38]

Further, this Court is not convinced that such evidence would be exculpatory or material. The fact that the DEA, at some time prior to the conspiracy, inspected Medex and did not find a violation is not exculpatory of the crimes charged. Further, the Government put forward substantial evidence of illegal distribution of controlled substances as discussed above such that any failure of the DEA to find illegality during a routine inspection would not undermine confidence in the jury's verdict in this case. "[T]here is never a real '*Brady* violation' unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict."[39] The alleged suppressed evidence—assuming it exists—does not meet this threshold.

### 2. Admission of Government's Evidence

Next, Defendant objects to the Court's decision to allow the Government to introduce a quantity of urine drug screens from Medex patients and notifications from insurance providers to Defendant regarding patients with multiple providers or pharmacies providing controlled substances. Defendant argues that the exhibits were misleading, prejudicial, and improper under Rule 404(b). Defendant argues that their admission was inappropriate to show a

---

[38] United States v. Scott, 555 F.2d 522, 528 (5th Cir. 1977).
[39] Matthew v. Johnson, 201 F.3d 353, 362 (5th Cir. 2000).

pattern of unauthorized prescribing where the rest of the patients' medical records and the confirmatory testing of the drug tests were not also introduced.

The Court maintains, as it did at trial, that these exhibits were properly admitted as evidence of Defendant's knowledge that his patients were not using their prescriptions correctly and the absence of mistake. The Fifth Circuit has held that that the practice of continuing to write prescriptions for patients despite clear signs of addiction and abuse is at odds with the standard of care.[40] The sheer quantity of failed drug screens and insurer notifications was probative of Defendant's knowledge that his patients were improperly using the prescriptions he issued or were abusing controlled substances and other drugs. This argument does not create a basis for a new trial.

### 3. Exclusion of Defendant's Witnesses and Evidence

Next, Defendant complains about the Court's decision to exclude certain of his witnesses and evidence, specifically (1) the testimony of Angela Mimms; (2) evidence regarding the Alexandria VA; (3) evidence regarding Defendant's cognitive impairment; and (4) evidence impeaching Valarie Stevenson. The Court will consider each in turn.

#### a. Angela Mimms

First, Defendant argues that the Court erred in excluding the testimony of Angela Mimms, the former office manager at Medex from 2004 through 2007. Defendant contends that Ms. Mimms would have testified regarding the nature of Defendant's practice at the clinic at that time. For example, he contends that she would have testified that Medex was primarily a family clinic; that Defendant kept it open and worked 18-hour days in the aftermath

---

[40] *Lamartiniere*, 100 F.4th at 655.

of Hurricane Katrina to help patients regardless of their ability to pay; that Defendant was not motivated by financial gain; and that he provided excellent care to his patients, including those addicted to opioids. Defendant argues that Ms. Mimms's testimony, in connection with the testimony of Medex's current office manager Robbie Wiggins, would have shown the jury "that there were common threads between Defendant's practice at Medex before the alleged conspiracy and during the conspiracy as well" and would have countered the Government's theory that Defendant was motivated by greed.[41]

The Court held at trial, and maintains now, that Ms. Mimms's proposed testimony was not relevant to the charges at issue. The operation of Medex and Defendant's positive character traits between 2004 and 2007 are not relevant to the crimes charged. This is especially true where the Government's theory of the case was that Defendant fundamentally changed the way that Medex operated when he began working at the Alexandria VA in February 2015. The fact that Defendant acted legally at some time in the past and that some things about the operations of Medex remained constant does not make it less probable that Defendant committed the crimes charged.

### b. Evidence regarding Alexandria VA

At trial, Defendant sought to introduce evidence regarding an internal investigation at the Alexandria VA into the prescribing practices of Defendant and one of his colleagues, Dr. Riveria. Defendant sought to introduce the fact that Dr. Riveria's prescribing practices resembled Defendant's but that he was not prosecuted. Defendant contends that this evidence—that his prescribing was similar to another doctor's—would have supported a finding that he was

---

[41] Doc. 242 at 22.

not prescribing in an unauthorized manner. Defendant also sought to suggest that the VA's investigation into his prescribing—which ultimately led to the investigation of his Medex practice—was motivated by the animus of another VA doctor. The Court prevented Defendant from introducing evidence regarding selective prosecution but allowed him to impeach the testimony of a VA employee by playing a portion of a recording in which she stated that Dr. Riveria was doing the "same thing" as Defendant.[42]

The Court maintains that evidence that another doctor acted similarly to Defendant but was not prosecuted was properly excluded as improperly suggesting selective prosecution. "Courts have consistently excluded evidence and argument by defendants seeking to attack the prosecution's motives in initiating prosecution."[43] Further, the Court allowed the jury to hear on impeachment evidence that Defendant and Dr. Riveria prescribed similarly, which was sufficient to allow Defendant to argue that his prescribing was within the usual course of professional practice.

### c. Impeachment of Valarie Stevenson

Next, Defendant objects to the Court's exclusion of impeachment evidence he sought to introduce in his cross-examination of nurse practitioner Valarie Stevenson. Defendant sought to introduce evidence that the Government had fabricated a nursing board complaint against Ms. Stevenson and that the fear of losing her license colored her testimony. But at trial, Ms. Stevenson testified that she knew about the complaint but had never seen it and did not know who filed it, undercutting the suggestion that the complaint

---

[42] Trial Tr. at 638, 641.
[43] United States v. Cleveland, No. 96-207, 1997 WL 253124, at *2 (E.D. La. May 14, 1997).

17

caused her to give testimony favorable to the Government.[44] At that point, the complaint had no further relevance and was properly excluded.

### d. Defendant's Cognitive Impairment

Finally, Defendant objects to the exclusion of evidence regarding his cognitive state. Defendant argues that he should have been permitted to offer the testimony of Anil Prasad that Prasad diagnosed Defendant with dementia in 2016 prior to Prasad's employment at Medex. Defendant contends that this diagnosis provided a viable theory of defense that Defendant did not have the specific intent to join the conspiracy charges.

This issue was the topic of a pre-trial motion in limine.[45] There, the Court explained that psychiatric evidence is admissible to negate specific intent "only in rare cases" where the evidence "focuses on the defendant's specific state of mind at the time of the charged offense."[46] The evidence at issue—that Prasad performed a neurological exam and diagnosed Defendant with dementia in October 2016—could not negate the specific intent requirement of the crimes charged. Significantly, Defendant has failed to explain how his alleged dementia or diminished capacity negated his specific intent.[47] Indeed, Defendant did not seek to admit expert testimony regarding his mental state.[48] Without more than Prasad's testimony, Defendant cannot

---

[44] Trial Tr. at 782.

[45] Doc. 191.

[46] *Id.* (quoting United States v. Cameron, 907 F.2d 1051, 1067 (11th Cir. 1990)).

[47] *See* United States v. Eff, 524 F.3d 712, 720 (5th Cir. 2008).

[48] *See* United States v. Orlansky, No. 03-20951-CR, 2006 WL 8434739, at *16 (S.D. Fla. Feb. 27, 2006) (excluding expert witnesses where they "acknowledged that they could not, with any reasonable degree of medical or scientific certainty, give an opinion concerning the onset of the progressive dementia or the mental state of [the defendant] during any of the years covered by the superseding indictment.").

show what effects his alleged dementia had on his ability to form the requisite intent to commit the crimes charged. Further, Prasad did not perform any forensic testing to support the diagnosis, and indeed, Defendant failed to follow through with the testing recommended by Prasad.[49] Finally, Defendant proffered Prasad's testimony on this issue and he admitted that while working at Medex he did not notice any signs of dementia from Defendant and began to suspect that he was faking it.[50] Accordingly, evidence regarding Defendant's cognitive state from Prasad could not have negated specific intent and would only have served to confuse the jury and invoke sympathy for Defendant. Courts have explained that "psychiatric evidence (1) will only rarely negate specific intent, (2) presents an inherent danger that it will distract the jury's from focusing on the actual presence or absence of *mens rea*, and (3) may easily slide into wider usage that opens up the jury to theories of defense more akin to justification."[51] Accordingly, this evidence was properly excluded.

### 4. *Prosecutorial Misconduct*

Defendant next makes several arguments in which he suggests misconduct by the Government warrants a new trial. The Court will consider each in turn.

#### a. *Misrepresentation*

Defendant argues that the Government committed prosecutorial misconduct when it represented to the Court that there was no "precise forensic evidence of Defendant's state of mind" during the time period of the

---

[49] Trial Tr. at 1067, 1071.
[50] *Id.* at 1070–71.
[51] *Cameron*, 907 F.2d at 1067.

conspiracy. Defendant contends that this incorrect statement misled the Court into excluding Prasad's testimony on Defendant's dementia diagnosis.

Defendant's alleged cognitive impairment and competency have been litigated *ad nauseum* in this case, and this Court is intimately aware of the evidence presented by both sides regarding Defendant's mental health. Accordingly, this Court was not, and indeed could not have been, misled by any statement of the Government regarding the available evidence. The Government's statement correctly pointed out that beyond the examination and preliminary diagnosis by Defendant's co-conspirator, there was no objective neuropsychological testing performed on Defendant suggesting dementia during the time period of the conspiracy.[52]

### b. *Prasad's Practice Fusion Account*

Next, Defendant argues that the Government's argument to the jury that Defendant was accessing and modifying digital medical records through Prasad's practice fusion account was not supported by the evidence in the record. This Court disagrees. At trial, it was revealed that Prasad's practice fusion account was set up on the evening before his first day of work and that the two-factor authentication phone number provided belonged to Defendant.[53] Therefore, the Government made the reasonable inference that Defendant

---

[52] *See* Doc. 64. ("A proper dementia diagnosis should include neuropsychological evaluation and testing. While Dr. Prasad performed a basic neurological examination, he did not conduct any neuropsychological testing. Given Dr. Prasad's diagnosis of possibly early onset Alzheimer's disease, one would have expected to see objective testing performed in connection with that diagnosis or at the very least immediately following the diagnosis. See Bloch, Tr. Vol. II at 97–99, 119. Dr. Prasad's diagnosis of a 'dementing process' and 'possibly early onset Alzheimer's disease' is not entitled to any weight as he failed to perform any objective testing, like a neuropsychological evaluation, and he was a colleague of Dr. Talbot's.").

[53] Trial Tr. at 2045–46.

could access Prasad's account. In fact, Defendant's own practice fusion expert,
Dr. Walter Sujansky, testified as much:

> Q. Would it change your opinion about who actually set up
> this Dr. Anil Prasad account if you understood that the SMS
> authentication message was sent to Dr. Adrian Talbot?
> A. Yes, it would.
> Q. It would make you believe, would it not, that Dr. Talbot,
> in fact, had the access information to Dr. Prasad's account;
> right?
> A. At that point in time, yes.
> Q. Well -- and I believe you testified that password was
> never changed, was it?
> A. Correct.[54]

Nearly every witness testified that Prasad would not arrive to Medex until late
morning, and Prasad testified that he never logged in remotely.[55] Office
manager Robbie Wiggins testified that Defendant arrived at the clinic around
4:30a.m. or 5:00a.m. before he left for his job at the Alexandria VA.[56]  The
practice fusion records revealed almost 3,000 prescriptions added or updated
by Prasad's account during the hours of midnight and 6:00a.m.[57] The practice
fusion records also showed activity on Prasad's account after he stopped
working at Medex. Accordingly, the Government had a good faith and

---

[54] *Id.* at 2047.
[55] *Id.* at 414, 1043, 1050, 1807.
[56] Trial Tr. at 351.
[57] Doc. 242-8.

reasonable basis for making the argument that Defendant was accessing Prasad's account.

### c. *"Bad Stuff"*

Next, Defendant takes issue with his recollection of the Government's statement in closing argument and rebuttal that Defendant prescribed patients the "bad stuff." Curiously, the transcript reveals that the Government never made that remark. Instead, the Government accurately quoted a witness, Joseph Coble, who referred to opioids as "the worst drugs possible."[58] To be sure, there was ample evidence about the addictive and harmful nature of opioids.

### d. *Mistreatment of Patient T.N.*

Next, Defendant objects, as he did at trial, to the Government's argument regarding the death of patient T.N. Defendant argues that in closing, the Government suggested to the jury that if Defendant had provided T.N. with proper medical care she might not have died from pulmonary fibrosis. Defendant contends that this statement was highly prejudicial and improper. At trial, this Court granted his request to instruct the jury that the Government was not suggesting that Defendant was responsible for T.N.'s death.

In fact, the Government's argument was entirely consistent with the evidence presented. Dr. Tricia Aultman, the Government's medical expert, told the jury about the different types of pain and explained that pain caused by rheumatoid arthritis should be treated with specific drugs that treat the

---

[58] Trial Tr. at 2366. Mr. Coble made this comment in reference to the drugs—Lortab, Lorcet, and Soma—that he had been prescribed by a prior doctor. *Id.* at 1834. There was ample evidence of Defendant prescribing these and similar drugs to his patients.

inflammatory process of the disease, not opioids.[59] T.N.'s husband then testified that T.N. died from pulmonary fibrosis caused by the rheumatoid arthritis from which she was suffering when she was Defendant's patient.[60] Defendant treated her with Percocet and did not refer her to a rheumatologist.[61] Accordingly, the Government's comment was supported by the evidence in the case and was not improper. Further, it was relevant to the Government's burden to establish that Defendant's prescribing of controlled substance was not for a legitimate medical purpose. Therefore, the probative value of the argument outweighed any prejudicial effect. Even so, the Court, out of an abundance of caution, instructed the Government to clarify to the jury that it was not suggesting that Defendant killed T.N. This argument too fails.

### e. Attacks on Defense Counsel

Finally, Defendant suggests that the prosecution "continually attacked" defense counsel in closing. Again, this is just simply not the case. Counsel for the Government rebutted arguments made by defense counsel and drew the jury's attention to his tactic of ignoring certain evidence in the record. The Government did not make any inflammatory or improper comments regarding defense counsel's character or demeanor.[62]

### 5. Unanimity

Defendant argues that a new trial is warranted because the Court rejected his request to include a special unanimity jury instruction. Defendant

---

[59] *Id.* at 1200.
[60] *Id.* at 1820.
[61] *Id.* at 1822–23.
[62] *See* United States v. Diaz-Carreon, 915 F.2d 951, 958 (5th Cir. 1990).

requested a special unanimity instruction because he believed that there was a risk that the jurors might not agree on with whom Defendant conspired in light of the employment changes at Medex. For example, Defendant explains, some jurors might believe that he conspired with office manager Robbie Wiggins and Prasad, while others might believe that Defendant conspired with nurse practitioner Maximo Martell, who left the practice early in the conspiracy period, and then Defendant later entered a separate conspiracy with Prasad.

Defendant is correct that the unanimity rule "requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged."[63] However, "[i]n the routine case, a general unanimity instruction will ensure that the jury is unanimous on the factual basis for a conviction, even where an indictment alleges numerous factual bases for criminal liability."[64] A special unanimity instruction is only warranted where there is a "genuine risk that the jury is confused or that a conviction may occur as the result of different jurors concluding that a defendant committed different acts."[65]

The Court gave the jurors a general unanimity instruction and denied Defendant's request for a special unanimity instruction. Here, Defendant was charged with one conspiracy and although there were different factual bases for that conspiracy, "'the crux of a conspiracy charge . . . [is][t]he defendant's voluntary agreement with another or others to commit an offense.'"[66] The Fifth

---

[63] United States v. Holley, 942 F.2d 916, 925 (5th Cir. 1991).

[64] Id.

[65] Id.

[66] United States v. Dvorin, 817 F.3d 438, 447 (5th Cir. 2016) (quoting United States v. Dillman, 15 F.3d 384, 391 (5th Cir. 1994)).

Circuit has held that "where a defendant is charged with one conspiracy, a special unanimity instruction is not required."[67] Accordingly, this argument fails.

### 6. **Defendant's Competence**

Next, Defendant reurges his contention that he was not competent to stand trial. This Court has considered the issue of Defendant's competence on four separate occasions, and each time found him competent to stand trial. It adopts those reasons here.[68] Defendant does not present anything new regarding his competence that would necessitate revisiting the issue. In fact, the Court's observation of Defendant during trial confirmed its belief that he was competent.[69]

### 7. **Dismissal of Juror 1**

Finally, Defendant objects to the Court's dismissal of Juror 1 prior to deliberations. The Court dismissed Juror 1 after the close of evidence but before deliberations because the undersigned and her staff consistently observed Juror 1 sleeping throughout the trial.[70] The undersigned's case manager brought water and mints to Juror 1 on several occasions in an attempt to keep him awake to no avail.[71] Defendant argues that his dismissal was improper where the Court did not first inquire whether he could still

---

[67] *Id.* at 447.
[68] Docs. 70, 93, 131, and 200.
[69] Trial Tr. at 2226–28.
[70] Trial Tr. at 2223–25.
[71] *Id.*

perform his duties. Defendant suggests that perhaps the juror was just closing his eyes.

Federal Rule of Criminal Procedure 24 authorizes the trial court to replace with an alternate any juror who is unable to perform his duties. "If sleep by a juror makes it impossible for that juror to perform his or her duties or would otherwise deny the defendant a fair trial, the sleeping juror should be removed from the jury."[72] The Fifth Circuit has held that there is "no doubt that a juror who cannot remain awake during much of the trial is unable to perform his duty."[73] Based on its own observations, the Court determined that Juror 1, who was asleep for a majority of the trial, was unable to perform his duties. Defendant does not cite to any case requiring this Court to question Juror 1 in order to reach this conclusion. Accordingly, his removal was not improper. Defendant has not shown that there was any miscarriage of justice necessitating a new trial.

## **CONCLUSION**

For the foregoing reasons, Defendant's Motion is **DENIED**.

New Orleans, Louisiana this 9th day of December, 2024.

---

[72] United States v. Freitag, 230 F.3d 1019, 1023 (7th Cir. 2000).
[73] United States v. Smith, 550 F.2d 277, 285 (5th Cir. 1977).

**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**